**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO.** 19-CR-148 |
| **v.** | **Counts 1, 7, 12: 18 U.S.C. § 371 (Conspiracy)** |
| **PRAKAZREL MICHEL, a/k/a "PRAS" MICHEL,** | **Count 2: 18 U.S.C. §§ 1001 & 2 (Concealment of Material Facts)** |
| **LOW TAEK JHO, a/k/a "JHO LOW",** | **Counts 3 & 4: 18 U.S.C. §§ 1519 & 2 (False Entry in Record)** |
| **Defendants.** | **Counts 5 & 6: 18 U.S.C. §§ 1512(b), 2 (Witness Tampering)** |
| | **Counts 8 & 9: 22 U.S.C. §§ 612, 618 and 18 U.S.C. § 2 (Foreign Agents Registration Act)** |
| | **Counts 10 & 11: 18 U.S.C. §§ 951 & 2 (Agent of a Foreign Government)** |

**SUPERSEDING INDICTMENT**

The Grand Jury charges:

**INTRODUCTION**

At all times relevant to this Indictment:

1. Between no later than in or about June 2012 through at least in or about January 2018, the defendants, PRAKAZREL MICHEL ("MICHEL") and LOW TAEK JHO ("LOW"), illegally sought to obtain foreign access to, and influence with, high-ranking United States government officials for financial benefit. In or about 2012, MICHEL and LOW illegally funneled money from LOW, a foreign national prohibited from making political contributions, into the 2012 election for the Office of the President of the United States of America in support of presidential Candidate A. Continuing until 2015, in furtherance of, and to conceal their scheme, MICHEL and LOW caused the filing of false reports with, and made false statements to, the Federal Election

Commission ("FEC"). Shortly thereafter, beginning in or about 2017, MICHEL and LOW conspired with others, including Elliott Broidy, Nickie Lum Davis, and George Higginbotham, all charged elsewhere, to wage an illegal, back-channel lobbying campaign to: (1) convince the Administration of the President of the United States ("Administration") and the United States Department of Justice ("DOJ") to drop forfeiture proceedings and related investigations into LOW for the embezzlement of billions of dollars from 1Malaysia Development Berhad ("1MDB"), a strategic investment and development company wholly owned by the Government of Malaysia; and (2) convince the Administration and DOJ to send a high-profile dissident of the PRC living in the United States back to the PRC.

## RELEVANT PARTIES & ENTITIES

2. Defendant PRAKAZREL MICHEL was a businessperson and entertainer living in the United States with international ties, including ties to LOW.

3. Defendant LOW was a wealthy businessperson and foreign national living in East Asia who was investigated and has been charged separately for his role in a scheme to embezzle billions of dollars from 1MDB.

4. Company A and Company B were British Virgin Islands companies with bank accounts in Singapore.

5. Company C was a company owned by MICHEL's financial adviser in or about 2012.

6. Company D and Company E were companies owned by MICHEL.

7. Foreign National A was an associate of LOW living outside the United States.

8. Associate A and Associate B were associates of MICHEL and/or LOW.

9. Candidate A was a candidate for the Office of President of the United States of America in the 2012 election cycle.

10. Political Committee A was a joint fundraising committee for Candidate A's political party. Political Committee A received campaign contributions for the election of Candidate A.

11. Political Committee B was an independent expenditure only committee that supported Candidate A's election efforts.

12. Individual A was a high-dollar fundraiser for Candidate A who worked closely with Political Committee A in organizing fundraising events.

13. Straw Donors F through Q were individuals through whom MICHEL and LOW made illegal foreign and conduit contributions to Political Committee A.

14. Company F and Company G were limited liability companies formed by MICHEL to receive wire transfers from LOW to pay MICHEL, Broidy, Lum Davis, and others for their lobbying efforts.

15. Elliott Broidy was a businessperson and political fundraiser and the Deputy Finance Chair for a national political party during and after the 2016 election cycle who maintained access to, and contact with, the then President of the United States of America ("the President") and high-ranking officials in the President's Administration.

16. Person D was a campaign official during the 2016 election cycle and worked as a political consultant after the 2016 election. Broidy was one of Person D's clients.

17. Nickie Lum Davis was a businessperson and consultant with international ties and political and business relationships with MICHEL and Broidy.

18. George Higginbotham was an associate of MICHEL and an attorney employed by DOJ.

19. PRC National A was a dissident of the PRC living in the United States on a temporary visa. The government of the PRC, including PRC Minister A and the President of the PRC, were seeking the removal of PRC National A from the United States back to the PRC.

**COUNT ONE**
**(Conspiracy to Defraud the United States and to Make Illegal Foreign and Conduit Contributions)**

20. The Grand Jury incorporates paragraphs 1 through 19 of this Indictment as though fully set forth herein.

21. From in or about June 2012 to in or about June 2015, in the District of Columbia and elsewhere, the defendants **PRAKAZREL MICHEL** and **LOW TAEK JHO**, knowingly conspired with each other and with others known and unknown to the Grand Jury to:

a. knowingly defraud the United States by impairing, obstructing, and defeating the lawful functions of a department or agency of the United States; to wit, the FEC's ability to administer federal regulations concerning source and dollar restrictions in federal elections, including the prohibitions applicable to foreign nationals and straw donors (also known as "conduits" or "straw contributors");

b. knowingly and willfully make foreign contributions directly and indirectly, aggregating to $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30121 and 30109(d)(1)(A); and

c. knowingly and willfully make contributions to a candidate for federal office in the names of other persons, aggregating to $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A), (D).

**Object of the Conspiracy**

22. The object of the conspiracy was for MICHEL and LOW to gain access to, and influence with, Candidate A and his administration, by secretly funneling foreign money from

LOW through MICHEL and other straw donors to Political Committees A and B, all while concealing from the candidate, the committees, the FEC, the public, and law enforcement the true source of the money.

**Manner and Means of the Conspiracy**

23. The manner and means by which MICHEL and LOW carried out the conspiracy included, but were not limited to, the following:

Use of Shell Entities and Shell Bank Accounts

24. MICHEL, LOW, and their intermediaries used shell entities and shell bank accounts to facilitate the transfer of millions of dollars from LOW to MICHEL for the purpose of funneling significant sums of money into the United States presidential election as purportedly legitimate contributions, all while concealing the true source of the money.

Use of Conduits

25. To conceal the true source of the contributions, and to facilitate illegal excessive contributions by LOW and MICHEL, MICHEL funneled millions of dollars from LOW to political committees through a series of approximately twenty straw donors or conduits, including MICHEL, Company D, Company E, and various individuals associated with MICHEL.

False Statements to the FEC

26. MICHEL used a network of straw donors, including Companies D and E, and others to make contributions of LOW's money to Political Committees A and B in the straw donors' names, in order to conceal the true source of the contributions. As a result, MICHEL caused Political Committees A and B to make false entries about the true source of the contributions in multiple reports submitted to the FEC. To further conceal the true source of the contributions, and to maintain his appearance as a high-dollar fundraiser for Candidate A, MICHEL made false

entries in a declaration he submitted to the FEC claiming that he, rather than LOW, was the source of contributions to Political Committee B.

Use of False Tax Records

27. To further conceal LOW as the true source of approximately $21,000,000 that was transferred to MICHEL from foreign accounts, and to help MICHEL avoid or reduce potential tax liability based on his receipt and distribution of the money, MICHEL created and submitted false tax records purporting to show that the foreign money he received from LOW and subsequently paid out to some of the straw donors was a gift unrelated to any effort to make illegal foreign contributions.

**The Election Act**

28. In the Federal Election Campaign Act of 1971, as amended, Title 52, United States Code, Sections 30101, *et seq.* ("Election Act"), Congress prohibited certain financial influences on the election of candidates for federal office, including the Office of President of the United States of America.

29. To prevent the influence of foreign nationals on federal elections, the Election Act prohibits foreign nationals, directly or indirectly, from making any contributions or independent expenditures in connection with federal elections. Further, the Election Act established limits on the amounts that even United States citizens or lawful permanent residents could contribute to a candidate or the candidate's authorized committee, including joint fundraising committees (which are committees established for the purpose of fundraising for multiple committees at the same time).

30. To prevent individuals from circumventing the Election Act, and to enable the detection of attempts to circumvent it, the Election Act prohibits a person from making a political

contribution in the name of another person, including giving funds to a straw donor for the purpose of having the straw donor pass the funds on to a federal candidate or to a candidate's federal campaign committee or joint fundraising committee, and using the straw donor's name as if they were making the contribution, rather than the true source of the money. The Election Act also prohibits contributing in the name of another to an independent expenditure committee spending to influence the outcome of that federal campaign.

31. The FEC is an agency and department of the United States with jurisdiction to enforce the limits and prohibitions of the Election Act, in part by requiring candidates, joint fundraising committees, and independent expenditure committees to file regular reports of the sources and amounts of the contributions they receive, as well as certain expenditures. To deter abuses of the Election Act and thus instill public confidence in the election process against corruption and the appearance of corruption, the Election Act requires the FEC to publish the reports that it receives so that all of the candidates, the entire public, and law enforcement may all see the specific information about the amounts and sources of political contributions and expenditures involving federal candidates and registered political committees.

32. Specifically, pursuant to the Election Act, Congress requires registered political committees, including Political Committee A and Political Committee B, to file periodic reports to the FEC of receipts and disbursements, identifying, among other things, the name and address of each person who made a contribution to such a committee during the relevant reporting period whose contribution or contributions had an aggregate amount of value in excess of $200 within the calendar year, together with the date and the amount of any such contribution.

33. In 2012, the Election Act prohibited any contribution by a foreign national to a joint fundraising committee and limited the amounts of contributions to joint fundraising committees from any one eligible United States person.

34. MICHEL and LOW were aware of the prohibitions on conduit and foreign contributions and were aware that federal political committees reported contributions that they received to a federal agency.

**Overt Acts**

35. In furtherance of the conspiracy and to effect its illegal object, MICHEL and LOW committed the following overt acts, among others, in the District of Columbia and elsewhere in connection with their efforts to secretly funnel money from LOW to Political Committees A and B.

**A. Conduit Contributions to Political Committee A and Attendance at Fundraisers**

36. On or about May 29, 2012, MICHEL forwarded an email chain between himself and a representative of a national political party committee to Associate A. In the email chain, MICHEL informed the committee official that "I'm thinking about doing a fund raiser for [Candidate A] sometime next month. I'm looking to raise anywhere from 5-10 million my contribution to the cause."

37. On or about the same day, May 29, 2012, Associate A forwarded the email chain to LOW. Associate A explained in his email to LOW, among other things, that MICHEL is in communication with the committee official, and "[t]hey are extremely interested and wants to do it." Associate A continued: "1-being a foreigner is not a problem as long u owned corporation in US just like [prominent fundraiser] etc… All donation can be made to the Super Pack and it can be unlimited. Very important though, anyone donating more than $40K will need to be vetted,

after the 4:30 conference call today, I will give u more updates. They also guarantee you a maximum 15 minutes audience with the [Candidate A] (one on one) that's huge brother.... Just wanted 2 share this with you, as to see it's real, just going thru the process."

38. In or about June 2012, MICHEL informed his financial advisor that he would receive a large sum of money from an individual MICHEL identified as "JHO," and that the first installment would be approximately $1,000,000. MICHEL's financial advisor offered to have the money temporarily maintained in the account of one of the financial advisor's companies, Company C.

39. On or about June 10, 2012, MICHEL received a private invitation for a fundraising event for Political Committee A to be held at the residence of a campaign supporter in Miami, Florida on June 26, 2012. The invitation stated that Candidate A would be in attendance at the fundraiser. The second page of the invitation indicated that attendance at the event required a contribution of at least $40,000. The invitation further stated, "Federal law requires us to use our best efforts to collect and report the name, mailing address, occupation and employer of individuals whose contributions exceed $200 in an election cycle." The invitation also outlined the prohibition on foreign and conduit contributions: "Federal Law prohibits foreign nationals, except lawfully admitted permanent residents of the U.S., from contributing to [Political Committee A]. By signing below, I certify that I am a U.S. citizen or lawfully admitted permanent resident of the U.S., the funds I am donating are not being provided to me by another person or entity for the purpose of making this contribution, and that my contribution shall be allocated as stated below."

40. On or about June 10, 2012, Associate A emailed LOW with the subject, "[Candidate A] Event June 26th.jpg." Associate A wrote, "This is the invitation for the event I BB u about, would u like to be host along with [another individual] on June 26th in Miami..."

Attached to the email was an invitation for the fundraising event for Political Committee A in Miami on June 26, 2012.

41. On or about June 13, 2012, Associate A received an email from Foreign National A in which Foreign National A asked for information regarding, among other things, "the amount to be contributed to the NGO[,]" "the wire transfer details of the NGO for international USD wires[,]" the date and other details regarding "the main event and dress code[,]" and the date and time for "the meetings . . . with (a) main guy (b) key people around main guy[.]" Foreign National A advised Associate A, "I will be contributing to the NGO in my personal capacity as [Foreign National A]," and then asked, "is it possible to contribute to the NGO via an offshore company? i.e. non USA company to protect my personal name's confidentiality?" Foreign National A further advised that "[t]here will be 3 guests attending the event: - one of them whom you know who is a Malaysian citizen. Pls keep name off e-mails. (to meet with the main guy + be at the event)[.]"

42. On or about June 13, 2012, Associate A forwarded Foreign National A's email referenced in the previous paragraph to MICHEL.

43. On or about June 14, 2012, MICHEL responded to Associate A's forwarded email. MICHEL provided banking information associated with Company C, and stated, "Yes it's fine to send wire from an offshore company." MICHEL provided information regarding the "[m]ain event," i.e., the fundraising event in Miami. He stated, "Once they receive the donation they give us the address where the event is taking place. The dress attire is suite and tie." MICHEL also wrote: "Meeting with the main guy occurs the day of the event and with his key people both that same day and the day after. They will give us an exact time and place once they receive their donation." MICHEL added, "His guys will meet and shake main guy hands but not as intimate as he will. Dress code same suite and tie."

44. On or about June 15, 2012, Associate A forwarded MICHEL's email referenced in the previous paragraph to Foreign National A and stated, "As you'll see they left (1) blank as 2 not discuss finance in their email." Associate A continued, "I was told the amount is $1 Mill to be wired to that none profit account set up 4 that purpose and upon receipt, this amount it will b forward 2 another party as u know." Associate A added, "Keep in mind to make transfer at ur earliest convenience, as it will have 2 b forwarded to them upon receipt and once they got it, they will send you the confirmation with address."

45. On or about June 15, 2012, LOW caused $1,000,000 to be transferred from Company A to Company C. Prior to the $1,000,000 transfer, Company C's account had a balance of approximately $65.

46. On or about June 18, 2012, MICHEL caused $150,000 to be transferred from Company C to MICHEL's personal account, which had a balance of approximately $1,343 at the time.

47. On or about June 18, 2012, MICHEL wrote a check to Political Committee A for $40,000 from his personal account.

48. On or about June 21, 2012, MICHEL caused an additional $200,000 to be transferred from Company C to MICHEL's personal account.

49. Starting on or about June 21, 2012, using the money he received from LOW, MICHEL began paying straw donors and directing them to make illegal conduit contributions to Political Committee A. Between on or about June 21, 2012, and on or about August 31, 2012, MICHEL made the following payments to straw donors and caused the following illegal foreign and conduit contributions, among others:

| Straw Donor | Date MICHEL Provided Money for Contribution | Amount of Money MICHEL Provided | Date of Straw Donation | Donation Amount |
|---|---|---|---|---|
| Donor F | June 21, 2012 | $30,000 | June 28, 2012 | $30,000 |
| Donors G & H | June 25, 2012 & June 26, 2012 | $80,000 | June 28, 2012 | $40,000 & $40,000 |
| Donors I & J | August 3, 2012 | $80,000 | August 7, 2012 & August 31, 2012 | $40,000 & $40,000 |
| Donor K | August 3, 2012 | $40,000 | August 13, 2012 | $40,000 |
| Donor L | August 7, 2012 | $40,000 | August 13, 2012 | $40,000 |
| Donor M | August 14, 2012 | $40,000 | August 23, 2012 | $40,000 |
| Donor N | August 14, 2012 | $40,000 | August 31, 2012 | $35,000 |
| Donor O | August 13, 2012 | $40,000 | August 27, 2012 | $40,000 |
| Donor P | August 17, 2012 | $75,000 | August 23, 2012 | $75,000 |
| Donor Q | August 22, 2012 | $40,000 | August 28, 2012 | $40,000 |

50. On or about June 25, 2012, LOW traveled from Singapore to Miami, Florida on his private jet to attend the fundraising event and meet Candidate A.

51. On or about June 26, 2012, MICHEL attended the fundraising event in Miami, Florida along with Associate A and Associate B, as well as some of the straw donors MICHEL recruited to make contributions to Political Committee A. MICHEL, Associate A, and Associate B met Candidate A at the event and took photographs with Candidate A. LOW did not attend.

52. On or about July 9, 2012, MICHEL's financial advisor emailed MICHEL, in part, "We did not receive a wire yet for the $600,000. What is the schedule of wires? Any updates?"

53. On or about July 11, 2012, MICHEL emailed his financial advisor, "By Friday I'll the 600k and I would say by next I'll have the 2m."

54. On or about July 20, 2012, Associate A forwarded to LOW an email from MICHEL that ostensibly included a message from Individual A, which stated in part: "By the way between you and I don't tell your guys yet but the BIG Man has a special bonus for your guy, he really appreciates his commitment to the campaign and he take cares of those who take care of him."

Associate A, in forwarding MICHEL's email to LOW, wrote to LOW, "You will like the email below… read…" On or about July 20, 2012, LOW replied to Associate A's email, "Done."

55. On or about August 2, 2012, LOW caused $600,000 to be transferred from Company B to MICHEL's personal account, which had a balance of approximately $35,575 at the time.

56. On or about August 7, 2012, LOW caused $9,000,000 to be transferred from Company B to one of MICHEL's companies, Company D. Prior to the transfer of $9,000,000, the balance in Company D's account was approximately $50.

57. Between on or about August 2, 2012, and on or about August 22, 2012, using the money he received from LOW, MICHEL paid more than approximately $800,000 to multiple straw donors, including, but not limited to, those set forth in paragraph 49 above, who in turn made contributions to Political Committee A totaling more than approximately $755,000.

58. On or about August 10, 2012, Associate A emailed Foreign National A, writing: "The confirmed date is Sept 11th and Sept 12th[.] Private thing on the 11th, working on plan 2 get senior at meeting with u on the 11th[.]"

59. On or about August 21, 2012, MICHEL's financial advisor sent him an email discussing tasks they needed to complete related to MICHEL's financial affairs. Among the tasks listed as "things we need to do," MICHEL's financial advisor wrote, "Letters from Joe indicating the gift to both [Company C] and [Company D]."

60. On or about September 7, 2012, MICHEL received from Individual A an email about a fundraising event in Washington, D.C. to be held at Individual A's residence on September 14, 2012. In the email, Individual A advised MICHEL, "Send this to your folks." Attached to the email was a private invitation to the fundraiser. The invitation included information similar to that

provided in the invitation to the Miami, Florida fundraiser in June 2012 referenced in paragraph 39, including the advisement concerning the prohibition on foreign and conduit contributions.

61. Between in or about August 2012 and in or about September 2012, MICHEL made efforts to secure permission for LOW and LOW's father to attend the fundraising event for Political Committee A at the residence of Individual A in Washington, D.C. in September 2012.

62. On or about September 14, 2012, MICHEL attended the fundraising event at the residence of Individual A in Washington, D.C., along with LOW's father, Associates A and B, and multiple straw donors MICHEL had recruited to make contributions to Political Committee A. During the fundraiser, MICHEL sat to one side of Candidate A, and LOW's father sat on the other side of Candidate A. MICHEL and LOW's father each took multiple personal photographs with Candidate A at the fundraiser, as did Associates A and B. LOW did not attend the event.

63. On or about November 6, 2012, LOW caused $11,000,000 to be transferred from Company A to Company D.

64. On or about April 5, 2013, for the purpose of preparing his income tax return, MICHEL provided his accountant a letter ostensibly from Foreign National A, LOW's associate, falsely stating that Foreign National A had gifted MICHEL $20,000,000 unrelated to any political contributions, when, in truth, LOW had caused the money to be transferred to MICHEL, at least in part for the purpose of making illegal, foreign contributions.

**B. Conduit Contributions to Political Committee B**

65. On or about September 7, 2012, using the money he received from LOW, MICHEL made a contribution of $250,000 to Political Committee B from the account of Company D. In the "MEMO" line associated with the payment, it read, "P MICHEL[.]"

66. On or about October 12, 2012, using the money he received from LOW, MICHEL made a contribution of $400,000 to Political Committee B in the name of Company E.

67. On or about October 24, 2012, using the money he received from LOW, MICHEL made a contribution of $475,000 to Political Committee B in the name of Company E.

**C. False Reports to the FEC**

68. On or about July 20, 2012, MICHEL caused Political Committee A to submit an FEC Form 3X "Report of Receipts and Disbursement for Other Than an Authorized Committee" to the FEC in Washington, D.C., falsely attributing multiple contributions to straw donors when in fact they were not the true source of the contributions. On or about June 3, 2013, MICHEL caused Political Committee A to submit an amended report containing the same false statements.

69. On or about September 20, 2012, MICHEL caused Political Committee A to submit an FEC Form 3X "Report of Receipts and Disbursement for Other Than an Authorized Committee" to the FEC in Washington, D.C., falsely attributing multiple contributions to straw donors when in fact they were not the true source of the contributions. On or about February 6, 2013, MICHEL caused Political Committee A to submit an amended report containing the same false statements.

70. On or about October 15, 2012, MICHEL caused Political Committee B to submit an FEC Form 3X "Report of Receipts and Disbursements for Other Than an Authorized Committee" to the FEC in Washington, D.C., falsely claiming that MICHEL was the true source of a contribution to Political Committee B when in fact LOW was the true source of the contribution.

71. On or about October 25, 2012, MICHEL caused Political Committee B to submit an FEC Form 3X "Report of Receipts and Disbursements for Other Than an Authorized

Committee" to the FEC in Washington, D.C., falsely claiming that Company E was the true source of contributions to Political Committee B when in fact LOW was the true source of the contributions.

72. On or about December 6, 2012, MICHEL caused Political Committee B to submit an FEC Form 3X "Report of Receipts and Disbursements for Other Than an Authorized Committee" to the FEC in Washington, D.C., falsely claiming that Company E was the true source of a contribution to Political Committee B when in fact LOW was the true source of the contributions. On or about January 30, 2013, MICHEL caused Political Committee B to submit an amended report containing the same false statement.

**D. Complaint with the FEC**

73. On or about April 13, 2015, a complaint was filed with the FEC alleging, in part, that MICHEL had illegally made contributions to Political Committee B "in the name of another" by causing Company E to contribute $875,000 to Political Committee B, concealing MICHEL as the source of the funds.

74. On or about June 15, 2015, in response to the complaint, MICHEL caused to be submitted to the FEC in Washington, D.C. a false declaration signed under the penalties of perjury, stating, in relevant part, that MICHEL "made four contributions to an independent expenditure only committee called [Political Committee B]," and that he "had no reason to hide the true source of [his] donations to [Political Committee B] nor did [he] wish to diminish the disclosure of source or amounts of [his] contributions to [Political Committee B] as being attributable to [him]." MICHEL made no reference to LOW in his declaration and concealed that LOW was the true source of the contributions made to Political Committee B.

All in violation of Title 18, United States Code, Section 371.

**COUNT TWO**
**Concealment of Material Facts**
**(Title 18, United States Code, Sections 1001(a)(1), and 2)**

75. The Grand Jury incorporates paragraphs 1 through 74 of this Indictment as though fully set forth herein.

76. From on or about July 20, 2012, until on or about June 15, 2015, in the District of Columbia and elsewhere, the defendant,

**PRAKAZREL MICHEL,**

knowingly and willfully falsified, concealed, and covered up, by a trick, scheme, and device, a material fact; to wit, he made and caused to be made false, fictitious, and fraudulent statements or representations in a matter within the jurisdiction of the executive branch of the government of the United States, by causing Political Committee A to make false statements in reports of receipts and disbursements filed with the FEC on or about July 20, 2012, September 20, 2012, February 6, 2013, and June 3, 2013, all of which falsely listed the names of straw donors as the true sources of the contributions; by causing Political Committee B to make false statements in reports of receipts and disbursements filed with the FEC on or about October 15, 2012, October 25, 2012, December 6, 2012, and January 30, 2013, all of which falsely listed MICHEL as the true source of the contributions; and by submitting and causing to be submitted a June 15, 2015, declaration to the FEC that falsely claimed that MICHEL made four contributions to Political Committee B, and that he had no reason to conceal the true source of the contributions, when, in fact, as MICHEL well knew, MICHEL had secretly funneled illegal foreign money from LOW to Political Committee B in MICHEL's name and the name of Company E to conceal LOW as the true source of the contributions.

All in violation of Title 18, United States Code, Sections 1001(a)(1) and 2.

**COUNT THREE**
**Making a False Entry in a Record**
**(Title 18, United States Code, Sections 1519 and 2)**

77. The Grand Jury incorporates paragraphs 1 through 74 of this Indictment as though fully set forth herein.

78. On or about June 3, 2013, in the District of Columbia and elsewhere, the defendant,

**PRAKAZREL MICHEL,**

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the investigation and proper administration of matters within the jurisdiction of departments and agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry in records and documents; to wit, MICHEL caused Political Committee A to make false statements in a report of receipts and disbursements filed with the FEC on or about June 3, 2013, that falsely listed the names of straw donors as the true sources of the contributions.

All in violation of Title 18, United States Code, Sections 1519 and 2.

**COUNT FOUR**
**Making a False Entry in a Record**
**(Title 18, United States Code, Sections 1519 and 2)**

79. The Grand Jury incorporates paragraphs 1 through 74 of this Indictment as though fully set forth herein.

80. On or about June 15, 2015, in the District of Columbia and elsewhere, the defendant,

**PRAKAZREL MICHEL,**

with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the investigation and proper administration of matters within the jurisdiction of departments and agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry

in records and documents; to wit, MICHEL submitted and caused to be submitted a declaration to the FEC claiming that he made four contributions to Political Committee B, and that he had no reason to conceal the true source of the contributions, when, in fact, as MICHEL well knew, MICHEL had secretly funneled illegal foreign money from LOW to Political Committee B in his name and the name of Company E to conceal LOW as the true source of the contributions.

All in violation of Title 18, United States Code, Sections 1519 and 2.

**INTRODUCTORY ALLEGATIONS FOR COUNTS 5-6**

81. The Grand Jury incorporates paragraphs 1 through 74 of this Indictment as though fully set forth herein.

Criminal Investigation and Case Involving Foreign and Conduit Contribution Scheme

82. In or about the fall of 2017, the Federal Bureau of Investigation ("FBI") opened a federal criminal investigation into MICHEL and LOW's foreign and conduit contribution scheme described above. In or about the summer of 2017, the FBI and the Office of Inspector General for the Department of Justice opened a federal criminal investigation into the unregistered lobbying scheme involving MICHEL, LOW, Broidy, Lum Davis, Higginbotham, and others.

83. In or about February 2018, MICHEL received a grand jury subpoena requesting records concerning both the foreign and conduit contribution scheme involving LOW and the unregistered lobbying scheme involving LOW, Broidy, Lum Davis, Higginbotham, and others.

84. Between in or about February 2018 and in or about May 2018, multiple straw donors testified before a grand jury in the District of Columbia.

85. On or about September 20, 2018, Individual A testified before a grand jury in the District of Columbia.

86. On or about November 15, 2018, and then again on or about April 12, 2019, the government met with MICHEL's counsel to discuss the federal criminal investigation of MICHEL, including the allegations of MICHEL's involvement in a foreign and conduit contribution scheme in or around 2012 and his efforts to conceal it.

87. On or about May 2, 2019, a grand jury returned an indictment charging MICHEL with four counts in connection with the scheme to defraud the FEC and to make foreign and conduit contributions.

88. On or about May 16, 2019, the government provided its first discovery production to MICHEL's counsel. Among the records produced were interview reports and the transcripts of the grand jury testimony of Individual A and multiple straw donors.

MICHEL's Obstruction Related to Straw Donor N, Individual A, and Others

89. Between on or about February 20, 2019, and on or about February 27, 2019, after the government informed MICHEL's counsel of the federal investigation of MICHEL for his involvement in a foreign and conduit contribution scheme, MICHEL and Straw Donor N—who had yet to be identified as a straw donor by law enforcement—exchanged several text messages in which MICHEL threatened legal action against Straw Donor N unless Straw Donor N repaid MICHEL the approximately $40,000 that MICHEL provided to Straw Donor N in 2012 for the express purpose of making a straw contribution to Political Committee A.

90. Between on or about February 27, 2019, and on or about March 14, 2019, after the government informed MICHEL's counsel of the federal investigation of MICHEL for his involvement in a foreign and conduit contribution scheme, MICHEL caused a law firm to send letters to several straw donors, including Straw Donor N. The letter to Straw Donor N, dated February 27, 2019, advised that "you are in breach of your contractual obligations to Mr.

Michel[.]" It further stated: "Mr. Michel loaned you $40,000.00, and you have failed to repay any portion of that loan. This is a material breach of your contractual obligation. Be advised that you must pay the entire amount of $40,000.00 to my client immediately." The letter warned Straw Donor N that if he did not pay MICHEL, "Mr. Michel will file suit for breach of contract and other claims. We will seek and obtain contractual damages, attorneys' fees and costs, past-due interest, and other related relief. We will also seek consequential damages against you." The letters to the other straw donors were substantially similar to the letter sent to Straw Donor N.

91. On or about July 14, 2019, after an indictment had been returned against MICHEL charging him with the conduit and foreign contribution scheme charged herein, Straw Donor N, who had yet to be identified or contacted by law enforcement, received a text message sent and caused to be sent from MICHEL. The text message read: "[Straw Donor N], listen it is strongly advise you do the right with our camaraderie. He is going court all this week starting tomorrow and as of now doj doesnt know definitively about you and the transaction from 2012. But all of that can change by tomorrow not only that but press will be there. Now I'm sure you nor your clients want to be mention in the media that you owe him 50k not a good look [Straw Donor N]. So to alleviate damages to you contact him before 1pm tomorrow. Just remember once you're mention theres no turning back I'm not sure if its worth 50k. Btw I wouldnt mention this to anyone. Best[.]"

92. On or about the same day, July 14, 2019, after an indictment had been returned against MICHEL charging him with the foreign and conduit contribution scheme charged herein, Individual A, who had testified as a witness in the investigation of MICHEL, received text messages sent and caused to be sent from MICHEL. The text messages read: "[Individual A], listen you know whats happening with our camaraderie is insignificant and political. Now we

know you been brought in as a witness but make no mistake you being protected. They know about the arranged visits both times, arranged calls made from one high end elected official to another foreign official, and think everything else that was done to assure the deal would go thru. Now your sauing grace is our friend he's the only one who knows it all. So it's only right you make it right being that he's the reason you walked away with over 50M. Understand we're not saying break any laws but you can get creative. If that means buying him out from [a business venture] or whatever, you not only owe him that cause he help you make a lot of money but he also kept his mouth shut, I'm sure you want to keep like that. So [Individual A] do something even if doing it thru your lawyer work it out so everything remains bury."

**COUNT FIVE**
**Witness Tampering**
**(Title 18, United States Code, Sections 1512(b)(1) and 2)**

93. The Grand Jury incorporates paragraphs 1 through 74 and 82 through 92 of this Indictment as though fully set forth herein.

94. On or about July 14, 2019, in the District of Columbia and elsewhere, the defendant,

**PRAKAZREL MICHEL,**

did knowingly and corruptly intimidate, threaten, and persuade and did knowingly and corruptly attempt to intimidate, threaten, and persuade Straw Donor N with the intent to influence, delay, or prevent the testimony of Straw Donor N in an official proceeding—that is, MICHEL caused a text message to be sent threatening Straw Donor N with potential legal and reputational harm, including threatening to refer Straw Donor N to the United States Department of Justice for criminal investigation, all in an effort to cause Straw Donor N to falsely characterize the $40,000 conduit payment from MICHEL as a loan and to prevent Straw Donor N from providing testimony in an official proceeding.

All in violation of Title 18, United States Code, Sections 1512(b)(1) and 2.

**COUNT SIX**
**Witness Tampering**
**(Title 18, United States Code, Sections 1512(b)(1) and 2)**

95. The Grand Jury incorporates paragraphs 1 through 74 and 82 through 92 of this Indictment as though fully set forth herein.

96. On or about July 14, 2019, in the District of Columbia and elsewhere, the defendant,

**PRAKAZREL MICHEL,**

did knowingly and corruptly intimidate, threaten, and persuade and did knowingly and corruptly attempt to intimidate, threaten, and persuade Individual A with the intent to influence, delay, or prevent the testimony of Individual A in an official proceeding—that is, MICHEL caused text messages to be sent to Individual A threatening to provide potentially incriminating information to federal law enforcement regarding Individual A in an effort to cause Individual A to withhold and alter his testimony in an official proceeding regarding MICHEL's criminal involvement with LOW.

All in violation of Title 18, United States Code, Sections 1512(b)(1) and 2.

**INTRODUCTORY ALLEGATIONS AS TO COUNTS 7-11**

97. The Grand Jury incorporates paragraphs 1 through 19 of this Indictment as though fully set forth herein.

98. In or about late 2016 through the present, DOJ was actively investigating transactions of LOW allegedly associated with laundered proceeds of the 1MDB embezzlement scheme. In or about July 2016, DOJ filed multiple civil forfeiture complaints seeking the forfeiture of millions of dollars in assets allegedly purchased with 1MDB laundered proceeds. On or about

November 1, 2018, DOJ filed a criminal indictment charging LOW and others with conspiring to launder billions of dollars embezzled from 1MDB and other conduct.

99. From no later than in or about March 2017 to at least in or about January 2018, MICHEL and LOW agreed that pursuant to a secret agreement, LOW would pay MICHEL, Broidy, Lum Davis, and Higginbotham millions of dollars to lobby the Administration and DOJ to drop the investigation of LOW for his role in the embezzlement of billions of dollars from 1MDB. As part of their efforts, MICHEL, LOW, and others concealed from the Administration and DOJ officials that Broidy was acting on behalf of LOW. Ultimately, MICHEL, LOW, and the other co-conspirators were unsuccessful in their efforts to have the 1MDB investigation dropped.

100. During the same approximate period, MICHEL and LOW also agreed that MICHEL, Broidy, Lum Davis, and Higginbotham would act in the United States as agents of PRC Minister A by working to lobby the Administration and DOJ to arrange for the removal and return of PRC National A—a dissident of the PRC living in the United States—back to the PRC all at the direction of PRC Minister A and the PRC government. As part of their efforts, MICHEL, LOW, and others concealed from the Administration and DOJ officials: (1) the agreement to operate within the United States subject to the direction of PRC Minister A and the PRC Government; (2) LOW's involvement in the scheme; and (3) the millions of dollars LOW was paying MICHEL and the other co-conspirators and the additional funds expected to be received by MICHEL and the other co-conspirators in the future if Foreign National A was deported or otherwise sent back to the PRC. Here, too, MICHEL, LOW, and the other co-conspirators were ultimately unsuccessful in getting PRC National A sent back to the PRC.

Criminal Prohibitions on Acting as an Agent of a Foreign Principal or Government

101. The Foreign Agents Registration Act, 22 U.S.C. § 611 *et seq.*, was and is a disclosure statute that requires any person acting in the United States as "an agent of a foreign principal" in connection with certain types of activities, such as political or public relations efforts or lobbying on behalf of the foreign principal, to register with the Attorney General. Such registrations are made to the National Security Division's Foreign Agents Registration Act Unit ("FARA Unit") within DOJ. It is a crime to knowingly and willfully fail to register, and to make false and misleading statements or material omissions in documents submitted to the FARA Unit under the law's provisions.

102. The purpose of FARA is to prevent covert influence by foreign principals. Proper registration under the statute allows the United States government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals. Among other things, a FARA registration reveals the identity of the foreign principal on whose behalf a registrant performs services, the type of services the registrant provides the foreign principal, the source and amount of compensation the registrant receives from the foreign principal, and political campaign contributions made by the registrant while the registrant was acting as an agent of the foreign principal.

103. MICHEL, LOW, Broidy, Lum Davis, and Higginbotham were aware of FARA and its registration requirement.

104. Section 951 of Title 18 of the United States Code makes it illegal to act as the agent of a foreign government without providing prior notification to the Attorney General. Acting as an agent of a foreign government is defined as agreeing to operate within the United States subject to the direction or control of a foreign government or official. The notification requirement serves

the national security and foreign policy interests of the United States by providing governmental awareness of the activities of any individual who is operating in the United States at the direction of a foreign government.

**COUNT SEVEN**
**18 U.S.C. § 371**
**(Conspiracy to Serve as an Unregistered Agent of a Foreign Principal and a Foreign Government and to Commit Money Laundering)**

105. From in or about March 2017 through in or about January 2018, in the District of Columbia and elsewhere, the defendants, **PRAKAZREL MICHEL & LOW TAEK JHO,** knowingly conspired with one another and others known and unknown to the Grand Jury for:

a. MICHEL and others to knowingly, intentionally, and willfully act as agents of a foreign principal, specifically, LOW, without registering with the Attorney General, in violation of the Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 612 and 618;

b. MICHEL and others to knowingly and intentionally act as agents of a foreign government, specifically, the PRC Government, without providing prior notification to the Attorney General, in violation of 18 U.S.C. § 951.

c. MICHEL, LOW, and others to knowingly and intentionally cause the transfer of funds to a place in the United States from a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, specifically, the violation of FARA referenced above, in violation of 18 U.S.C. § 1956(a)(2)(A); and

d. MICHEL, LOW, and others to, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, knowingly and intentionally conduct and cause to be conducted financial transactions designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity, specifically, the violation of FARA referenced above, in violation of 18 U.S.C. § 1956(a)(1)(B).

**Objects of the Conspiracy**

106. It was an object of the conspiracy for MICHEL, LOW, Broidy, Lum Davis, Higginbotham, and others, known and unknown, to orchestrate a back-channel, unregistered

campaign to lobby the President and his Administration and DOJ to end the 1MDB investigation or otherwise resolve the matters favorably for LOW.

107. It was an object of the conspiracy for MICHEL, LOW, Broidy, Lum Davis, Higginbotham, and others, known and unknown, to orchestrate a back-channel, unregistered campaign to lobby the President, Administration, DOJ, Department of Homeland Security ("DHS"), and FBI to remove PRC National A from the United States.

108. It was an object of the conspiracy for MICHEL, Broidy, Lum Davis, Higginbotham, and others, known and unknown, to make millions of dollars by leveraging Broidy's access to, and perceived influence with, the President and the Administration in order to secure payments from LOW.

109. It was an object of the conspiracy for MICHEL, LOW, Broidy, Lum Davis, Higginbotham, and others, known and unknown, to cause the transfer of millions of dollars from foreign accounts associated with LOW to accounts in the United States to promote the unlawful lobbying activity in the United States.

110. It was an object of the conspiracy for MICHEL, Broidy, Lum Davis, Higginbotham, and others, known and unknown, to cause the transfer of millions of dollars between accounts within the United States to conceal the nature, location, source, ownership, and control of the proceeds of the unlawful lobbying activity in the United States.

111. It was an object of the conspiracy for MICHEL, Broidy, Lum Davis, Higginbotham, and others, known and unknown, to conceal their contacts and relationships, including their financial relationships, with LOW to maintain credibility with United States officials and to further the illegal advocacy scheme.

**Manner and Means of the Conspiracy**

112. The manner and means by which MICHEL, LOW, Broidy, Lum Davis, Higginbotham, and others, known and unknown, carried out the conspiracy included, but were not limited to, the following:

International Travel to Meet with Foreign Principals and Government Officials

113. MICHEL, Broidy, Lum Davis, and Higginbotham, in various combinations, traveled to Thailand, Malaysia, and the PRC for the purpose of meeting with LOW, PRC Minister A, and others to negotiate and discuss the arrangement by which Broidy would lobby the President, the Administration, and DOJ—outside of official channels—on behalf of LOW and the government of the PRC in exchange for millions of dollars.

Meetings and Contacts with United States Officials

114. With the assistance of MICHEL and Lum Davis, Broidy lobbied officials, both directly and through intermediaries, at the highest levels of the United States government, including the President, for the benefit of LOW and PRC Minister A.

Layered Financial Transactions

115. MICHEL, LOW, Broidy, Lum Davis, Higginbotham, and others, known and unknown, agreed that they would be paid millions of dollars for the lobbying campaign on behalf of LOW. MICHEL, LOW, Broidy, Lum Davis, Higginbotham, and others, known and unknown, agreed that wire transfers should not be initiated directly by LOW to ensure that the money could not be traced directly to LOW. MICHEL formed Company F and Company G to serve as shell companies and opened bank accounts in the names of Company F and Company G to serve as intermediary accounts in the United States. Further, MICHEL, Broidy, and Lum Davis agreed that the wire transfers from Company F and elsewhere would be directed to Broidy through the bank

account of Law Firm A, which would in turn transfer the money to Broidy and pay a commission to Lum Davis.

Concealment

116. MICHEL, LOW, Broidy, Lum Davis, Higginbotham, and others, known and unknown, agreed to conceal the agreement to lobby on behalf of LOW and to lobby for the removal of PRC National A on behalf of PRC Minister A. MICHEL, Broidy, Lum Davis, Higginbotham, and others, known and unknown, concealed, agreed to conceal, and attempted to conceal from United States government officials and the public the arrangement with LOW, the payments from LOW, and the nature of their introduction to PRC Minister A to conceal LOW's role in the meeting. With respect to the work on behalf of LOW to resolve DOJ actions related to 1MDB, MICHEL and others willfully failed to register with the FARA Unit or the Attorney General under FARA. With respect to the work on behalf of PRC Minister A to lobby for the removal of PRC National A, MICHEL and others knowingly failed to notify the Attorney General of the agreement to operate within the United States subject to the direction of PRC Minister A and the PRC government. In extensive contacts and communications in furtherance of the conspiracy, MICHEL, Broidy, Lum Davis, and Higginbotham were secretive and anonymized references to LOW. Further, MICHEL, Broidy, and Lum Davis often used encrypted applications when communicating about LOW and PRC National A to conceal their illicit conduct.

**Overt Acts**

117. In furtherance of the conspiracy and to effect its illegal objects, MICHEL, LOW, Broidy, Lum Davis, Higginbotham, and others, known and unknown, committed the following overt acts, among others, in the District of Columbia and elsewhere.

## I. Campaign to Resolve 1MDB Matters

### A. The Conspirators Agreed Broidy Would Lobby for LOW for an $8 Million Retainer

118. In or about March 2017, MICHEL spoke with Lum Davis about LOW. Lum Davis, in turn, told Broidy that she had a possible client in Malaysia who could use help with a forfeiture matter.

119. In or about early March 2017, MICHEL requested that Lum Davis send him Broidy's biography describing Broidy's relationship with high-ranking officials in the Administration and photographs of Broidy and the President. MICHEL wanted the photographs so that he could highlight to LOW Broidy's close access to the President and the Administration.

120. On or about March 13, 2017, Lum Davis forwarded to MICHEL a "Retainer and Fee Agreement – Litigation Services" between Law Firm A and LOW so that MICHEL could present the agreement to LOW. The "Retainer and Fee Agreement" stipulated that LOW would pay an $8 million retainer fee upfront, and an additional $75 million success fee if the "matter" was resolved within 180 days, or $50 million if the "matter" was resolved within 365 days. The draft agreement included an Exhibit A explaining that the "matter" referred to the 1MDB forfeiture proceedings. MICHEL, Broidy, Lum Davis, and Law Firm A provided no litigation services or legal advice to LOW. The true purpose of the retention agreement was to secure Broidy's services to lobby the Administration and DOJ on LOW's behalf based on Broidy's political connections.

121. On or about March 20, 2017, MICHEL caused the incorporation of Company F and Company G, shell companies created to received millions of dollars from LOW to fund the unregistered lobbying campaign.

122. From in or about March 2017 until no later than January 2018, despite their knowledge of the requirement to register as agents of a foreign principal, MICHEL, LOW, Broidy,

Lum Davis, and Higginbotham, agreed, implicitly or explicitly, to conceal Broidy's relationship with LOW, and to intentionally and willfully fail to register with the FARA Unit regarding Broidy's, MICHEL's, Lum Davis's, and Higginbotham's work as agents of LOW.

**B. MICHEL, Broidy, and Lum Davis Met LOW in Bangkok**

123. In or about April 2017, MICHEL asked Broidy to travel to Bangkok, Thailand to meet with LOW.

124. On or about April 28, 2017, at MICHEL's direction, Higginbotham prepared a purported consulting agreement between Company F and LOW as part of an effort to falsely characterize MICHEL's work for LOW. The purported agreement stipulated that LOW would pay a $25 million retainer fee upfront, and an additional $300 million upon successful resolution of the matter. At MICHEL's direction, Higginbotham did not include LOW's name in the agreement and referred to LOW as "WuTang" in emails in order to conceal the identity of LOW.

125. On or about May 2, 2017, MICHEL, Broidy, and Lum Davis arrived in Bangkok. During the trip, they met with LOW and discussed the 1MDB investigation and civil forfeiture actions. Broidy agreed to lobby the Administration and DOJ for a favorable result for LOW. With respect to payment, Broidy expressed concern about ensuring that any funds received would not be subject to seizure. LOW stated that he had "friends" who could pay Broidy and others. MICHEL told Broidy and Lum Davis that Higginbotham was verifying the legitimacy of the funds. Higginbotham did not actually perform any such review.

**C. MICHEL Received $8.5 Million from LOW**

126. Following the meeting with LOW, on or about May 8, 2017, MICHEL's company, Company F, received a wire transfer directed by LOW for approximately $2.8 million from an entity in Hong Kong. That same day, MICHEL caused $1 million to be transferred to Law Firm

A. Within several days, approximately $900,000 of the $1 million was transferred from the Law Firm A account to one of Broidy's business accounts.

127. On or about May 17, 2017, LOW caused an international wire in the approximate amount of $3 million to be sent to Company F from a Hong Kong company. That same day, MICHEL transferred $3 million from Company F to Law Firm A.

128. On or about May 18, 2017, Law Firm A transferred $600,000 to one of Broidy's business accounts and $900,000 to one of Lum Davis's business accounts. Within approximately one week, Law Firm A transferred an additional $950,000 in two separate transfers to one of Broidy's business accounts.

129. On or about May 25, 2017, LOW caused a third transfer to be made to Company F, this time in the amount of approximately $2.7 million. On or about May 26, 2017, MICHEL transferred $2 million from Company F to Law Firm A. That same day, Law Firm A transferred $600,000 to one of Lum Davis's business accounts. In or about early June 2017, Law Firm A transferred $650,000 to one of Broidy's business accounts.

**D. The Conspirators Facilitated Meetings for Malaysian Prime Minister A and Lobbied to Resolve the 1MDB Cases**

130. Between in or about June and in or about September 2017, Broidy contacted high-ranking officials in the Administration, including the President, to attempt to arrange a golf game between Malaysian Prime Minister A and the President to allow Malaysian Prime Minister A to attempt to resolve the 1MDB matter.

131. On behalf of LOW, MICHEL regularly sought updates regarding Broidy's progress and pressured Broidy and Lum Davis to achieve results.

132. On or about August 7, 2017, Broidy sent his assistant an email with the subject, "Malaysia Talking Points *Final*", which contained the purported talking points of Malaysian

Prime Minister A intended for an upcoming meeting between the United States Secretary of State and Malaysian Prime Minister A. Lum Davis had received the talking points from MICHEL—who provided them on behalf of LOW—and provided them to Broidy, intending that Broidy would then provide them to the Secretary of State as background for the meeting. The talking points identified 1MDB as a "[p]riority[,]" noted the lack of harm caused by 1MDB, and specified that "[t]he involvement of US prosecutors has caused unnecessary tension American, and could cause a negative reaction among Malaysians[.]"

133. On or about August 9, 2017, LOW caused a Hong Kong company to transfer approximately $12.8 million to Company F. MICHEL then transferred $3 million from Company F to Law Firm A. On or about the next day, Law Firm A transferred $900,000 to one of Lum Davis's business accounts. In the ensuing days, Law Firm A transferred hundreds of thousands of dollars to accounts belonging to Broidy.

134. On or about September 12, 2017, Malaysian Prime Minister A met with the President at the White House. Although Broidy contacted high-ranking officials in the Administration to arrange a golf meeting between the President and Malaysian Prime Minister A in addition to the official meeting, no golf game between Malaysian Prime Minister A and the President took place.

135. On or about October 6, 2017, Broidy met with the President at the White House. Broidy represented to MICHEL, Lum Davis, and others that he lobbied on LOW's behalf during the meeting.

## II. Campaign to Remove PRC National A from the United States

### A. The Conspirators Traveled to China to Meet with PRC Minister A

136. In or about May 2017, following the trip to Bangkok, the conspirators traveled to Hong Kong to meet again with LOW and a foreign government official of the PRC to discuss PRC National A.

137. On or about May 12, 2017, MICHEL sent Lum Davis an article regarding PRC National A and stated, "This all I can find with his name, he's no where to be found."

138. On or about May 18, 2017, MICHEL, Broidy, and Lum Davis traveled to Hong Kong and were transported to Shenzhen, China, where they met with LOW and PRC Minister A. PRC Minister A asked Broidy to use his influence with high-ranking United States government officials to advocate for PRC National A's removal and return to the PRC. PRC Minister A also stated that he would be visiting Washington, D.C. soon and was having trouble scheduling meetings with certain high-ranking United States government officials. MICHEL, Broidy, Lum Davis, and LOW agreed that Broidy and others would lobby the Administration and DOJ on PRC Minister A's behalf.

139. From in or about May 2017 until in or about January 2018, MICHEL, LOW, and others knowingly failed to notify the Attorney General of their work at the direction of PRC Minister A and the PRC government to lobby for the removal of PRC National A.

### B. The Conspirators Lobbied U.S. Officials for the Removal of PRC National A

140. On or about May 22, 2017, Lum Davis emailed to MICHEL a document titled, "EXPLANATION OF LEGAL ISSUE," which contained a description of the alleged crimes of PRC National A. MICHEL had previously provided this file to Lum Davis on a thumb drive during their trip to China.

141. On or about May 22, 2017, Broidy sent an email to Person D with the subject, "Opportunity for Significantly Increased Law Enforcement Cooperation between US and China[,]" which included a memorandum addressed to the Attorney General. The content of the memorandum, at least in part, had originated from PRC Minister A and LOW and was provided to Broidy through MICHEL and Lum Davis. Broidy intended that Person D would provide the memorandum to the Attorney General. The memorandum did not disclose: (1) the agreement to operate within the United States subject to the direction of PRC Minister A and the PRC Government; (2) the payments previously received from LOW; or (3) the payments expected to be received by MICHEL and the other co-conspirators in the future if PRC National A was deported or otherwise sent back to the PRC.

142. The memorandum advocated for the Attorney General to meet with PRC Minister A to discuss the removal and return of PRC National A to the PRC.

143. In or about late June and early July 2017, as part of his efforts to obtain information to pass on to LOW, PRC Minister A, and representatives of the PRC regarding PRC National A, MICHEL met with special agents of the FBI and lobbied for the return of PRC National A to the PRC and sought to confirm details regarding PRC National A's security and location on behalf of LOW and PRC Minister A.

144. On or about July 10, 2017, MICHEL emailed himself copies of the Red Notice for PRC National A, images of PRC National A's passport and identity card, and other documents related to PRC National A and the alleged crimes committed by PRC National A, including talking points supporting the removal of PRC National A.

145. In or about July 2017, MICHEL, on behalf of PRC Minister A, requested that Higginbotham meet with the PRC Ambassador to the United States at the PRC Embassy in

Washington, D.C. The purpose of the meeting was to convey a message to the PRC Ambassador about PRC National A. On or about July 16, 2017, at MICHEL's direction, Higginbotham went to the PRC Embassy in Washington, D.C. and met with the Ambassador. During the meeting, Higginbotham told the Ambassador that United States government officials were working on the extradition of PRC National A and that there would be additional information in the future concerning the logistics of the extradition. Following the meeting, Higginbotham reported to MICHEL what had occurred, and MICHEL said he would inform LOW. MICHEL later told Higginbotham that LOW was happy with the meeting and that it had given LOW credibility with the PRC.

146. On or about August 24, 2017, LOW directed the transfer of approximately $10 million to MICHEL's company, Company G, which had entered into a purported "Strategic Communications and Crisis Management" agreement with a representative of LOW for €8.4 million. MICHEL subsequently transferred $7.5 million to Lum Davis and falsely represented to Lum Davis that the transfer was part of an investment from LOW's associate in an entertainment venture.

147. On or about September 3, 2017, MICHEL and Higginbotham traveled to Macau, China to meet with LOW to discuss ways to continue to funnel LOW's money into the United States to pay those involved in the lobbying campaigns. Because LOW was concerned that United States banks would not allow him to transfer large sums of money in or through the United States financial system, MICHEL, Higginbotham, and LOW agreed to use a cover story that would conceal from United States financial institutions LOW's connection to these funds and, instead, claim that the funds were for entertainment purposes.

148. On or about September 20, 2017, LOW directed the transfer of approximately $30 million to Company F, which had entered into a purported loan agreement with a representative of LOW. The "loan agreement" stated that LOW's representative was "interested in considering an investment in" MICHEL's company, Company F, and the money was "for the purposes of working capital and/or general corporate purposes of [Company F] and/or its subsidiaries or associated companies."

149. On or about October 23, 2017, LOW, based on MICHEL's requests, directed the transfer of approximately $41 million to a bank account controlled by Higginbotham from a representative of LOW.

All in violation of Title 18, United States Code, Section 371.

**COUNT EIGHT**
**22 U.S.C. §§ 612 and 618 and 18 U.S.C. § 2**
**(Unregistered Agent of a Foreign Principal and Aiding and Abetting)**

150. The Grand Jury incorporates paragraphs 1 through 19 and 98 through 149 of this Indictment as though fully set forth herein.

151. From in or about no later than May 2017 to at least in or about January 2018, within the District of Columbia and elsewhere, the defendant,

**PRAKAZREL MICHEL,**

knowingly and willfully, without registering with the Attorney General as required by law, acted as an agent of a foreign principal, and aided and abetted Broidy's, Higginbotham's, and Lum Davis's knowing and willful unregistered actions as agents of a foreign principal—to wit, LOW—by executing an unregistered, back-channel lobbying campaign to resolve the 1MDB investigation favorably for LOW.

All in violation of Title 22, United States Code, Sections 612 and 618(a)(1), and Title 18, United States Code, Section 2.

**COUNT NINE**
**22 U.S.C. §§ 612 and 618 and 18 U.S.C. § 2**
**(Unregistered Agent of a Foreign Principal and Aiding and Abetting)**

152. The Grand Jury incorporates paragraphs 1 through 19 and 98 through 149 of this Indictment as though fully set forth herein.

153. From in or about no later than May 2017 to at least in or about January 2018, within the District of Columbia and elsewhere, the defendant,

**LOW TAEK JHO,**

knowingly and willfully aided and abetted MICHEL's, Broidy's, Lum Davis's, and Higginbotham's knowing and willful unregistered actions as agents of a foreign principal—to wit, LOW—in their unregistered, back-channel lobbying campaign to resolve the 1MDB investigation favorably for LOW.

All in violation of Title 22, United States Code, Sections 612 and 618(a)(1), and Title 18, United States Code, Section 2.

**COUNT TEN**
**18 U.S.C. § 951**
**(Agent of a Foreign Government)**

154. The Grand Jury incorporates paragraphs 1 through 19 and 98 through 149 of this Indictment as though fully set forth herein.

155. From in or about no later than May 2017 to at least in or about January 2018, within the District of Columbia and elsewhere, the defendant,

**PRAKAZREL MICHEL,**

knowingly, without notifying the Attorney General as required by law, acted as an agent of a foreign government and foreign official, specifically, the PRC Government and PRC Minister A, and aided and abetted Broidy's, Higginbotham's, and Lum Davis's actions as agents of the PRC Government and PRC Minister A, by agreeing to operate in the United States at the direction of PRC Minister A in executing a back-channel lobbying campaign to convince the Administration to return PRC National A to the PRC.

All in violation of Title 18, United States Code, Sections 951 & 2.

**COUNT ELEVEN**
**18 U.S.C. § 951**
**(Agent of a Foreign Government)**

156. The Grand Jury incorporates paragraphs 1 through 19 and 98 through 149 of this Indictment as though fully set forth herein.

157. From in or about no later than May 2017 to at least in or about January 2018, within the District of Columbia and elsewhere, the defendant,

**LOW TAEK JHO,**

knowingly, aided and abetted MICHEL's, Broidy's, Higginbotham's, and Lum Davis's actions as agents of a foreign government and foreign official, specifically, the PRC Government and PRC Minister A, without notifying the Attorney General as required by law, through their agreement to operate in the United States at the direction of PRC Minister A in executing a back-channel lobbying campaign to convince the Administration to return PRC National A to the PRC.

All in violation of Title 18, United States Code, Sections 951 & 2.

**COUNT TWELVE**
**18 U.S.C. § 371**
**(Conspiracy to Make False Statements to Banks)**

158. The Grand Jury incorporates paragraphs 1 through 19 and 98 through 149 of this Indictment as though fully set forth herein.

159. From in or about March 2017 through in or about January 2018, in the District of Columbia and elsewhere, the defendant **PRAKAZREL MICHEL**, knowingly conspired with Higginbotham and others, known and unknown to the Grand Jury, to knowingly make false statements for the purpose of influencing federally insured financial institutions upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, and insurance agreement and application for insurance and a guarantee, and any change and extension of any of the same, by renewal, deferment of action and otherwise, and the acceptance, release, and substitution of security therefor, in violation of Title 18, United States Code, Section 1014.

**Object of the Conspiracy**

160. It was an object of the conspiracy for MICHEL, Higginbotham, and others, known and unknown, to funnel millions of dollars from foreign bank accounts into United States bank accounts controlled by MICHEL by misrepresenting to financial institutions the source and purpose of the funds.

**Manner and Means of the Conspiracy**

161. The manner and means by which MICHEL, Higginbotham, and others, known and unknown, carried out the conspiracy included, but were not limited to, the following:

162. MICHEL created shell companies—Company F and Company G—to receive millions of dollars in foreign wire transfers to fund the unregistered lobbying campaign described above and to disguise the payments as related to other legitimate business ventures.

163. MICHEL and Higginbotham drafted various false written agreements to disguise the millions of dollars in foreign wire transfers as legitimate business ventures unrelated to the unregistered lobbying campaign.

164. MICHEL and Higginbotham funneled millions of dollars in foreign wire transfers intended to fund the unregistered lobbying campaign into a bank account belonging to Higginbotham to disguise the connection to the unregistered lobbying campaign.

165. MICHEL and Higginbotham made misrepresentations to financial institutions regarding the source and purpose of the wire transfers to open and/or maintain accounts to receive and maintain the funds at those institutions.

**Overt Acts**

166. In furtherance of the conspiracy and to effect its illegal objects, MICHEL, Higginbotham, and others, known and unknown, committed the following overt acts, among others, in the District of Columbia and elsewhere.

**A. The Wire Transfers and Fake Contracts**

167. On or about March 20, 2017, MICHEL caused the incorporation of Company F and Company G, shell companies created to receive millions of dollars from LOW to fund the unregistered lobbying campaign.

168. From on or about May 1, 2017, through in or about October 2017, MICHEL and Higginbotham created false fee, loan, and investment agreements and false contracts purporting to justify hundreds of millions of dollars in fees and payments to be made by foreign companies to

MICHEL's shell companies, Company F and Company G, all in an effort to disguise LOW as the true source and the true purpose of international wire transfers in furtherance of the unregistered lobbying campaigns regarding the 1MDB investigation and the removal of PRC National A.

169. On or about May 8, 2017, Company F received a wire transfer directed by LOW for approximately $2.8 million from an entity in Hong Kong.

170. On or about May 17, 2017, Company F received a wire transfer directed by LOW for approximately $3 million from an entity in Hong Kong.

171. On or about May 25, 2017, Company F received a wire transfer directed by LOW for approximately $2.7 million from an entity in Hong Kong.

172. On or about August 9, 2017, Company F received a wire transfer directed by LOW for approximately $12.8 million from an entity in Hong Kong.

173. On or about August 24, 2017, Company G received a wire transfer directed by LOW for approximately $10 million from an entity in Hong Kong.

174. On or about September 20, 2017, Company F received a wire transfer directed by LOW for approximately $30 million from an entity in Hong Kong.

175. On or about October 23, 2017, LOW directed the transfer of approximately $41 million to a bank account controlled by Higginbotham.

**B. The False Statements to Financial Institutions**

176. Between in or about July and September 2017, Financial Institution A, an institution with accounts insured by the Federal Deposit Insurance Corporation ("FDIC"), sent inquiries to MICHEL, MICHEL's money manager, and Higginbotham concerning the source and purpose of the millions of dollars in transfers directed by LOW into MICHEL's business accounts at Financial Institution A.

177. On or about September 19, 2017, after receipt of a €25 million wire eventually deposited in United States dollars into Company F's account at Financial Institution A, MICHEL's money manager asked the purpose of the funds. MICHEL responded that he and Higginbotham would provide "all the necessary documents for the compliance department." On or about September 25, 2017, MICHEL's money manager explained in an email to Financial Institution A that Higginbotham would provide "source and destination information." A representative of Financial Institution A then asked Higginbotham for the information, and Higginbotham forwarded the email to MICHEL stating, "We urgently need this information. Please provide asap."

178. On or about September 27, 2017, in order to influence Financial Institution A's ongoing due diligence, MICHEL directed Higginbotham to send a detailed written response to Financial Institution A misrepresenting the source of the transfers directed by LOW and the purpose of the funds. Prior to sending the response to Financial Institution A, Higginbotham sent the draft to MICHEL, which included questions for MICHEL and instructions to "please read carefully." Specifically, the written response misrepresented that the Hong Kong company was the source of the funds and that the funds were to finance MICHEL's "entertainment matters" and to retain a law firm to assist the Hong Kong company to "resolve a highly complex civil litigation matter." The response was provided to Financial Institution A. On or about September 28, 2017, Financial Institution A informed MICHEL that his business accounts at Financial Institution A would be closed on or before October 28, 2017, and that no further wire transfers would be accepted.

179. In or about October 2017, MICHEL and Higginbotham opened accounts at Financial Institution B, a broker-dealer registered with the Securities and Exchange Commission

that had arrangements with federally insured banks for offering certain account services. MICHEL and Higginbotham then deposited the funds from the closed accounts at Financial Institution A into Financial Institution B.

180. Between in or about October and November 2017, Financial Institution B sent inquiries to MICHEL and Higginbotham concerning the source and purpose of the millions of dollars deposited into MICHEL's business accounts at Financial Institution B. In order to influence Financial Institution B's due diligence, MICHEL misrepresented to a representative of Financial Institution B that the money was a foreign investment in MICHEL's entertainment projects. Additionally, on or about November 6, 2017, in order to influence Financial Institution B's ongoing due diligence, MICHEL directed Higginbotham to send a written response to Financial Institution B misrepresenting the source and the purpose of the funds. Prior to sending the response to a representative of Financial Institution B, Higginbotham sent a draft to MICHEL. Specifically, the written response misrepresented that the Hong Kong company was the source of the funds, and that the Hong Kong company was "an investor in a slate of projects the are currently under review and subject to further discussion." In or about November 2017, Financial Institution B closed MICHEL's business accounts.

181. In or about December 2017, Financial Institution C, an institution with accounts insured by the FDIC, inquired about the source and purpose of $41 million deposited into Higginbotham's account. In order to influence Financial Institution C's due diligence, Higginbotham misrepresented that the money was an investment in one of Higginbotham's client's music and entertainment projects.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATIONS

182. The allegations contained in Counts 1 through 9 and Count 12 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

183. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of Counts 1 through 9 and 12, the defendant, **PRAKAZREL MICHEL,** shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said violations. Notice is further given that, upon conviction, the United States intends to seek a judgment against **PRAKAZREL MICHEL** for a sum of money representing the property described in this paragraph.

184. The allegations contained in Counts 1, 7, and 9 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

185. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of Counts 1, 7, and 9, the defendant, **LOW TAEK JHO,** shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said violations. Notice is further given that, upon conviction, the United States intends to seek a judgment against **LOW TAEK JHO** for a sum of money representing the property described in this paragraph.

186. If any of the property described above, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;
b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;
d. has been substantially diminished in value; or
e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL.

Dated: ______________________

______________________________

GRAND JURY FOREPERSON

COREY R. AMUNDSON
Chief, Public Integrity Section
United States Department of Justice

_________________________
By: John D. Keller
Principal Deputy Chief
Sean F. Mulryne
Deputy Director, Election Crimes
Nicole R. Lockhart
Trial Attorney
Public Integrity Section